UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KELSEY P. MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:13CV131 CDP |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying Kelsey P. Mitchell's application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*, in which she claimed she was disabled because of bipolar disorder, oppositional defiant disorder (ODD), and attention deficit hyperactivity disorder (ADHD).  After a hearing, an Administrative Law Judge (ALJ) concluded that Mitchell was not disabled.  Because I find that the ALJ committed no legal error and his decision was based on substantial evidence on the record as a whole, I affirm.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. As such, she is substituted for Michael J. Astrue as the defendant in this cause of action.  Fed. R. Civ. P. 25(d).

# I.  Procedural History

Mitchell filed her application for supplemental security income on March 1, 2010, alleging a disability onset date of December 1, 2004.  (Tr. 105-08.)[2]  On May 26, 2010, the Social Security Administration denied her claim for benefits.  (Tr. 48, 49, 50-53.)  Upon Mitchell's request, an administrative hearing was held before an ALJ on October 18, 2011, at which Mitchell and a vocational expert testified.  (Tr. 27-47.)  On November 21, 2011, the ALJ issued a decision denying Mitchell's claim for benefits, finding Mitchell able to perform work in the national economy such as housekeeper/cleaner and hand presser.  (Tr. 6-26.)  On November 27, 2012, the Appeals Council denied Mitchell's request for review of the ALJ's decision.  (Tr. 1-5.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review,[3] Mitchell contends that the ALJ committed legal error by failing to properly acknowledge the Commissioner's regulations on substance abuse and assess disability thereunder, and by failing to consider the circumstances underlying Mitchell's purported failure to follow prescribed treatment.  Mitchell further argues that the ALJ's decision is not

---

[2]  The ALJ determined that the application was protectively filed on February 16, 2010.  (Tr. 9.)

[3]  In her Complaint, Mitchell claims she is disabled because she suffers from depression, anxiety, a learning disability, cannabis dependence, ADHD, obsessive compulsive disorder (OCD), and obesity.

supported by substantial evidence on the record as a whole inasmuch as the ALJ
failed to properly consider the medical opinion evidence of record.  Mitchell
requests that the final decision be reversed and that she be awarded benefits, or that
the matter be remanded for further consideration.  For the following reasons, the
decision of the Commissioner will be affirmed.

## II.  Testimonial Evidence Before the ALJ

A.      Mitchell's Testimony

At the hearing on October 18, 2011, Mitchell testified in response to
questions posed by the ALJ and counsel.

At the time of the hearing, Mitchell was twenty-two years of age and
currently attended Meramec Community College.  (Tr. 29-30.)  Mitchell stood five
feet, five inches tall and weighed 192 pounds.  (Tr. 37.)

Mitchell testified that she previously worked at restaurants and at Johnnie
Brock's but worked at each location for less than a week because of her inability to
cope with people and the public.  (Tr. 31.)  Mitchell also testified that she
withdrew from a number of classes at the community college because she felt she
was being judged and therefore did not go to class.  Mitchell also testified that she
had difficulty following directions and with reading because of dyslexia and that
she received special services at the community college, including untimed tests and
use of a calculator.  (Tr. 38-40.)

Mitchell testified that she currently sees a doctor for depression, anxiety, and ADHD and that these conditions cause her to be afraid in public and feel suicidal and homicidal.  (Tr. 34-35.)  Mitchell testified that she sees her doctor every two weeks but that he had recently been out of town.  Mitchell testified that medication for her condition causes muscle cramps, slurred speech, and a dry mouth.  (Tr. 41, 43.)  Mitchell testified that she underwent six electroconvulsive therapy (ECT) treatments but did not return for additional treatments because she thought she was going to die.  Mitchell testified that her doctor recommended that she undergo additional treatments, but she declined.  (Tr. 33-34.)

Mitchell testified that she has difficulty concentrating and cannot follow directions and that she becomes angry in such situations and starts hitting and punching things.  Mitchell testified that she often does not finish a task, such as cleaning her room or loading the dishwasher.  Mitchell testified that she becomes upset when people are rude to her.  Mitchell testified that she is easily overwhelmed and cries and becomes upset when she is stressed.  (Tr. 41-42.)

Mitchell testified that she currently smokes marijuana up to three times a week to calm her when she is agitated, but that she does not smoke as much as she did in the past.  Mitchell testified that her doctor recommended that she stop smoking marijuana.  (Tr. 32, 34.)

As to her daily activities, Mitchell testified that she has had a boyfriend for

three years and that they "just hang out."  Mitchell testified that they recently went

to a pumpkin patch.  Mitchell testified that she listens to music.  Mitchell testified

that she reads for school and attends classes three days a week for fifty minutes

each day.  Mitchell testified that she has a driver's license but does not drive often.

(Tr. 35-37, 43-44.)

B.     <u>Testimony of Vocational Expert</u>

     Ms. Gonzalez, a vocational expert, testified at the hearing in response to

questions posed by the ALJ.

     The ALJ asked Ms. Gonzalez to assume an individual twenty years of age

with twelve years of education and no past relevant work at the level of substantial

gainful activity.  The ALJ asked Ms. Gonzalez to further assume that the individual

could perform the full range of light work and was

> able to understand, remember, and carry out at least simple
> instructions on non-detailed tasks; can maintain regular . . . attendance
> and work presence without special supervision; should not work in a
> setting, which includes constant, or regular contact with the general
> public; should not perform work, which includes more than infrequent
> handling of customer complaints.

(Tr. 44-45.)

Ms. Gonzalez testified that such a person could perform work as a housekeeper/

cleaner, of which 21,660 such jobs existed in the State of Missouri and 887,890

nationally; and hand presser, of which 1210 such jobs existed in the State of

Missouri and 60,440 nationally.  (Tr. 45.)

The ALJ then asked Ms. Gonzalez to assume an individual who was limited as Dr. Robinson opined in his October 2011 Assessment,[4] to which Ms. Gonzalez testified that such a person could not work.  (Tr. 45-46.)

### III.  Medical Evidence Before the ALJ

On February 15, 2007, Mitchell visited Dr. Bryan Sewing who noted that Mitchell was diagnosed with ADHD at three years of age.  Dr. Sewing also noted that Mitchell had previously been "labeled" with ODD, anxiety, bipolar affective disorder, and learning disabled; and that Mitchell's past medications included Ritalin, Adderall, Dexedrine, Concerta, Effexor, Zoloft, Strattera, Risperdal, Trileptal, and Abilify.  Mitchell reported that she currently felt depressed, had poor self-esteem, and was failing school.  Mitchell also reported that she used marijuana on a daily basis.  Mental status examination showed Mitchell to be friendly, engaged, and to have good eye contact.  Mitchell's speech was fluent with normal amount and volume.  Mitchell's mood was "okay" and her affect was euthymic. Mitchell denied any auditory or visual hallucinations, suicidal or homicidal ideations, paranoia, obsessions, or feelings of hopelessness.  Dr. Sewing noted Mitchell's flow of thought to be logical, sequential, and goal directed.  Dr. Sewing

---

[4]  *See* summary of medical evidence *infra* at pp. 46-47.

diagnosed Mitchell with ADHD, mood disorder not otherwise specified, learning disorder not otherwise specified, and anxiety not otherwise specified.  Dr. Sewing instructed Mitchell to increase her dosage of Zoloft.  (Tr. 296.)

Mitchell returned to Dr. Sewing on March 12, 2007, who noted reports to show Mitchell to have an above-average IQ.  Mitchell's father reported that Mitchell experienced rapid and unpredictable mood swings.  Dr. Sewing noted Mitchell to be compliant with her medication and to have improved sleep, appetite, energy, and concentration.  Mitchell denied any substance abuse.  Mental status examination was unchanged.  Dr. Sewing instructed Mitchell to continue with her current regimen.  (Tr. 295.)

Mitchell visited Dr. Sewing on April 18, 2007, who noted Mitchell to be doing relatively well.  Mitchell was compliant with her medication.  Mitchell reported that she was finishing school, earning fair grades, and was looking forward to community college the following year.  Mitchell denied substance abuse and reported continued improvement in sleep, appetite, energy, and concentration.  Dr. Sewing continued in his diagnoses and prescribed Abilify, Zoloft, Concerta, Topamax, and Melatonin.  (Tr. 294.)

From June through October 2007, Mitchell visited Dr. Sewing on three occasions with noted improvement on each occasion.  Mitchell was noted to be compliant with her medication, and the medication was adjusted for continued

improvement.  (Tr. 291-93.)

On January 9, 2008, Mitchell visited Dr. Sewing who noted Mitchell to be noncompliant with her medication.  Mitchell denied any substance abuse.  Dr. Sewing noted Mitchell to not be in school.  Mitchell was slightly agitated. Mitchell's mood was okay, and her affect was tearful.  Dr. Sewing continued in his diagnoses and instructed Mitchell to restart Abilify and Cymbalta.  (Tr. 290.)

On April 3, 2008, Dr. Sewing noted Mitchell to have been compliant with her medications for one week.  Mitchell reported that she felt more stable, and Dr. Sewing observed Mitchell to be much improved since her last visit.  Mitchell denied any substance abuse.  Dr. Sewing instructed Mitchell to continue with Abilify and Cymbalta.  (Tr. 289.)

Mitchell returned to Dr. Sewing on May 15, 2008, who noted Mitchell to be noncompliant with her medication and to currently be abusing marijuana and alcohol.  Mental status examination was unremarkable.  Dr. Sewing diagnosed Mitchell with bipolar affective disorder and prescribed Abilify, Cymbalta, and Lamictal.  (Tr. 288.)

On May 20, 2008, Mitchell visited Dr. Gordon H. Robinson, a psychiatrist, and reported a history of bipolar disorder, ADHD, and OCD.  Mitchell reported that "they" thought she was "crazy" and indicated that she did not know why she was visiting a psychiatrist.  Mitchell was eighteen years of age at the time and was

accompanied by her parents.  Mitchell reported being explosive and violent with

her mother with threats to hit her and with episodes of actually striking her on five

occasions in the previous two years.  Mitchell reported that her manic episodes

lasted up to a few hours, but that she was depressed fifty percent of the time.

Mitchell reported having negative feelings and that she never felt happy.  Mitchell

reported having thoughts of suicide but had no intention to act on her thoughts.

Mitchell reported that she began smoking marijuana when she was sixteen years of

age and developed a habit such that she no longer got "high" despite smoking large

quantities of the drug.  Mitchell reported that she stopped smoking marijuana on

May 11, 2008.  Dr. Robinson noted Mitchell's past medications to include Ritalin,

Dexedrine, Adderall, Cylert, Concerta, Strattera, Effexor, Zoloft, Celexa, Lexapro,

Paxil, Risperdal, Seroquel, and Depakote, but that Mitchell was never hospitalized

psychiatrically.  Mitchell reported feeling better with her current medications,

Abilify and Cymbalta.  Dr. Robinson noted that Mitchell stopped taking her

medication in December and that her parents noticed in January that she engaged

in rapid cycling and manic behavior.  Mitchell reported that she attended

community college for one semester but failed all of her classes because she

skipped classes and got high using marijuana.  Mitchell's parents reported that

Mitchell was involved in six automobile accidents within the previous year, and

Dr. Robinson indicated that ADHD and bipolar disorder could cause an individual

to drive carelessly and have difficulty paying attention to driving.  Mental status examination showed Mitchell to be clean and well groomed and to have good eye contact.  Dr. Robinson noted no tics, tremors, psychomotor retardation, or agitation.  Mitchell showed anger toward her parents.  Dr. Robinson observed Mitchell to be tearful at times, as well as calmer at times.  Mitchell was irritable toward her mother but pleasant toward Dr. Robinson.  Dr. Robinson noted Mitchell to be logical and sequential and to speak with regular rate and rhythm.  Mitchell denied having any hallucinations, delusions, or suicidal and homicidal ideas.  Dr. Robinson noted Mitchell's judgment and insight to be fair.  Upon conclusion of the evaluation, Dr. Robinson diagnosed Mitchell with ADHD; bipolar disorder, most recent episode depressed; OCD; and cannabis dependence.  Dr. Robinson assigned a Global Assessment of Functioning (GAF) score of 60, and opined that Mitchell's highest GAF score within the past year was 60.[5]  At Mitchell's request, Dr. Robinson instructed Mitchell to continue with Abilify.  Dr. Robinson prescribed Fluoxetine and instructed Mitchell to discontinue Cymbalta.  Dr. Robinson also prescribed Lamictal for bipolar disorder.  Dr. Robinson instructed Mitchell to return in two weeks.  (Tr. 203-09.)

---

[5]  A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  *Diagnostic and Statistical Manual of Mental Disorders*, *Text Revision 34* (4th ed. 2000).  A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

On May 23, 2008, Mitchell was admitted to St. John's Mercy Medical Center for stabilization after a severe episode of aggressive behavior toward her mother. Dr. Steven A. Harvey noted Mitchell to have a long history of mood instability with problematic use of alcohol and marijuana, but that this was her first psychiatric hospitalization. Although Mitchell reported that she did not engage in activities because of depression, Dr. Harvey noted that she seemed to spend a lot of time socializing with friends. Mental status examination showed no extreme symptoms. Dr. Harvey noted Mitchell's insight and judgment to be poor. Lithium was added to Mitchell's treatment regimen during her admission, and Mitchell did very well. Upon discharge on May 27, 2008, Mitchell was diagnosed with bipolar disorder, mixed episode, in remission; alcohol dependence; and marijuana abuse. Mitchell's discharge medications were Lithium carbonate, Lamictal, Prozac, and Abilify. Dr. Harvey instructed Mitchell to participate in outpatient therapy. (Tr. 307-21.)

Mitchell visited Dr. Harvey on May 29, 2008, and reported that she was doing well and was happy. Mitchell reported abstention from alcohol and marijuana. Mental status examination showed Mitchell to be pleasant and cooperative with no psychosis. Dr. Harvey noted Mitchell's mood to be euthymic and her affect stable. Mitchell's insight and judgment were fair. Dr. Harvey noted Mitchell to show some signs of withdrawal from marijuana. A goal was set for

Mitchell to get a job.  Mitchell was instructed to continue with her current medications.  (Tr. 305.)

On June 13, 2008, Mitchell reported to Dr. Harvey that she was doing quite well but was irritable after having gotten drunk.  Mitchell also reported a one-time use of marijuana.  Mitchell reported that she obtained a job but left after three hours because she had a meltdown.   Mitchell reported that she swam and was going out a lot.  Mental status was unchanged.  Mitchell was instructed to continue with her medications and to make arrangements for therapy.  (Tr. 304.)

Mitchell returned to Dr. Harvey on June 26, 2008, and reported that she had regressed.  Mitchell admitted to drinking and smoking marijuana and reported not taking her medications on a couple of occasions.  Mitchell's parents reported Mitchell to be verbally aggressive at times.  Dr. Harvey noted Mitchell's current medications to be Abilify, Lamictal, Lithium, and Prozac.  Dr. Harvey instructed Mitchell to continue with her current medications and to continue to visit with her therapist.  (Tr. 303.)

On July 24, 2008, Mitchell reported to Dr. Harvey that she was doing well and had no problems.  Dr. Harvey noted Mitchell to have abstained from alcohol and to have not smoked marijuana for two weeks.  Mitchell reported that therapy was going well.  Mental status examination was unchanged.  Dr. Harvey questioned whether Mitchell was bipolar and noted that Mitchell's mood problems

- 12 -

associated with alcohol and marijuana had worsened.  Dr. Harvey instructed Mitchell to continue with her current medications and with therapy.  Mitchell was instructed to return in four weeks for follow up.  (Tr. 302.)

On October 21, 2008, Mitchell's father called Dr. Harvey and reported that Mitchell was not doing well, was drinking again, and recently had a temper outburst.  Dr. Harvey noted Mitchell not to have appeared for her most recently scheduled appointment and invited her to return for treatment.  (Tr. 301.)

Mitchell returned to Dr. Harvey on October 28, 2008, and reported that she had not been well for five or six weeks.  Mitchell reported that she was not compliant with her medication and had not seen her therapist.  Mitchell reported having recently consumed alcohol and having had a little marijuana.  Dr. Harvey noted Mitchell to be very irritable.  Mitchell reported that she bit her mother and punched a hole in a door.  Mental status examination showed Mitchell to be pleasant and cooperative with normal speech and flow of thought.  Mitchell reported having no psychosis or suicidal/homicidal ideations.  She was alert and fully oriented.  Mitchell's mood was euthymic and her affect stable.  Dr. Harvey noted Mitchell's insight and judgment to be fair.  Dr. Harvey diagnosed Mitchell with bipolar disorder.  Dr. Harvey instructed Mitchell to abstain from substance abuse, take her medication faithfully, and attend her upcoming appointment with her therapist.  Dr. Harvey told Mitchell that she could feel better by the weekend if

she complied with her treatment.  (Tr. 299.)

Mitchell visited Dr. Harvey on November 4, 2008, who noted Mitchell to be doing better in that she was less irritable and not violent.  Dr. Harvey observed Mitchell to be overly irritable toward her parents but nice to him.  Mitchell admitted to snorting Adderall three or four times a week.  Dr. Harvey instructed Mitchell to continue with her medications and to abstain from substance abuse, including Adderall abuse.  Dr. Harvey also instructed Mitchell to continue with therapy.  (Tr. 298.)

Mitchell returned to Dr. Robinson on December 4, 2008, and reported being a "bad kid."  Mitchell reported that she argued with her mother every day, with such episodes usually ending in a physical altercation.  Mitchell reported that she lied a lot.  Mitchell reported that she smoked marijuana every day, beginning shortly after waking up in the afternoon.  Mitchell reported that she sleeps seven to eight hours a night, but usually goes to sleep around 5:30 a.m. after being with friends.  Mitchell reported not going to school and not having a job.  Dr. Robinson noted Mitchell to remain depressed.  Mitchell reported not feeling happy and that she continued to have mood swings.  Dr. Robinson noted Mitchell's current medications to include Lithium, Lamictal, Abilify, and Prozac, but Mitchell believed that medication did not help her.  Mental status examination showed Mitchell to be clean and well groomed.  She was not restless or tremulous.

- 14 -

Mitchell's eye contact was noted to be okay, but she had a restricted and somewhat angry affect.  Mitchell denied having suicidal or homicidal thoughts.  Dr. Robinson noted Mitchell's insight and judgment to be poor.  Dr. Robinson diagnosed Mitchell with ADHD; bipolar disorder, most recent episode depressed; OCD; and cannabis dependence.  Dr. Robinson assigned a GAF score of 60.  Dr. Robinson discontinued Fluoxetine because of its ineffectiveness and instructed Mitchell to increase her dosages of Lithium and Lamictal.  (Tr. 209-12.)

Mitchell returned to Dr. Robinson on December 18, 2008, and reported that she did not want to change her behavior and did not want to talk to doctors. Mitchell's father reported that she had become more violent and disrespectful toward her mother, with two episodes resulting in calls to the police.  Mitchell's mother reported that Mitchell was calmer while taking medication, and both parents reported that Mitchell was better until she stopped taking her medication for three days.  Mitchell reported that she forgot to take her medication.  Mental status examination showed Mitchell's eye contact to be fair.  Mitchell was not restless or tremulous.  Her affect was dysphoric and somewhat agitated.  Dr. Robinson noted Mitchell to be logical and sequential, and Mitchell spoke with a regular rate and rhythm.  Mitchell continued to deny having suicidal or homicidal thoughts.  Dr. Robinson noted Mitchell's insight and judgment to be poor.  Dr. Robinson continued in his diagnoses and continued to assign a GAF score of 60.

Dr. Robinson provided Mitchell with strategies to help her remember to take her medication. Dr. Robinson prescribed Haloperidol and Lorazepam for agitated episodes. (Tr. 212-14.)

On January 12, 2009, Dr. Robinson noted Mitchell's behavior to improve since she began taking her medication regularly. Mitchell reported feeling better and that the medication helped. Dr. Robinson noted Mitchell to remain quite symptomatic, however. Mental status examination was unchanged from the last visit. Dr. Robinson continued in his diagnoses and GAF score. Dr. Robinson instructed Mitchell to increase her dosage of Lamictal and set a goal of finding a job within the month. Dr. Robinson instructed Mitchell to return in two weeks. (Tr. 214-16.)

On February 23, 2009, Mitchell reported to Dr. Robinson that she was very emotional and felt good one moment and angry the next. Mitchell reported that she no longer threatened her mother but instead punched holes in the wall when frustrated. Mitchell reported having looked for a job with no success. Mitchell reported taking her medication every day but that she also smoked marijuana every day. Mitchell reported being afraid of the dark and of being alone. Mental status examination showed Mitchell to have a fine, bilateral tremor and to have a labile affect. Dr. Robinson noted Mitchell to move from anxious and angry to silly and playful in a very short amount of time. Given that Mitchell was so symptomatic,

- 16 -

Dr. Robinson determined to increase her dosage of Lithium.  Dr. Robinson

encouraged Mitchell to engage in reasonable exercise and referred her for a sleep

study to rule out obstructive sleep apnea.  Dr. Robinson instructed Mitchell to

return in two weeks.  (Tr. 217-18.)

On March 6, 2009, Mitchell telephoned Dr. Robinson's office to cancel her

scheduled appointment.  Dr. Robinson noted that Mitchell refused to come.  (Tr.

218.)

Mitchell returned to Dr. Robinson on April 3, 2009, and reported that she

had no recent break downs, had not threatened or stolen from her mother, and was

compliant with her mother's instructions.  Mitchell reported that she changed her

behavior because her boyfriend and friends did not think it was okay for her to

threaten her mother.  Mitchell reported that she was looking for a job.  Mitchell

continued to report mood swings and disruptive sleep.  Dr. Robinson noted

Mitchell to sleep from 10:00 p.m. until noon.  Mental status examination was

unchanged from the last visit.  Dr. Robinson continued in his diagnoses and GAF

score, noting Mitchell to have improved.  Dr. Robinson instructed Mitchell to

remain on her current medications.  (Tr. 219-20.)

On April 25, 2009, Mitchell reported to Dr. Robinson that she had no rage

attacks, was not belligerent or irritable, and that she and her boyfriend were doing

well.  Mitchell reported feeling angry that she had gained weight.  Mitchell

reported having recently had an anxiety attack that lasted for twenty minutes, and further reported that she experienced such attacks about every six months. Mitchell continued to report disrupted sleep, but Dr. Robinson noted that she had not yet made an appointment with a sleep doctor.  Mitchell reported that she planned to take one class at a community college during the summer but was anxious about it.  Mental status examination showed Mitchell to have good eye contact but a restricted affect.  Mitchell was logical and sequential and spoke with a regular rate and rhythm.  Mitchell denied having suicidal or homicidal thoughts. Dr. Robinson noted Mitchell's insight and judgment to be better.  Dr. Robinson continued in his diagnoses and GAF score, noting Mitchell to be making slow but steady progress.  Mitchell's current medications were Abilify, Lithobid, Lamictal, Haloperidol, and Lorazepam.  (Tr. 221-22.)

On April 30, 2009, Dr. Robinson determined to increase Mitchell's dosage of Lithobid, noting Mitchell to continue to be symptomatic.  (Tr. 222.)

Mitchell returned to Dr. Robinson on May 9, 2009, and reported continued mood swings between angry and sad emotions.  Mitchell's parents reported that Mitchell was "a lot better" than she was before in that she was no longer threatening and defused from her angry outbursts more quickly.  Mitchell reported that she fatigued easily, did not exercise, and smoked marijuana every day. Mitchell was lethargic and slept through part of her appointment.  Mental status

examination showed Mitchell to have poor eye contact and a restricted affect.

Mitchell was logical and sequential and spoke with a regular rate and rhythm.

Mitchell denied having suicidal or homicidal thoughts.  Dr. Robinson noted

Mitchell's insight and judgment to be better.  Dr. Robinson continued in his

diagnoses and GAF score, noting Mitchell to be doing better than before.  Dr.

Robinson provided Provigil to help with sleepiness and ADHD symptoms.  (Tr.

223-24.)

Mitchell returned to Dr. Robinson on June 8, 2009, and reported feeling

more depressed and irritable.  Mitchell expressed feelings of hopelessness.

Mitchell reported sleeping twelve to fourteen hours a day and that she forgets

things very quickly.  A recent sleep study failed to show sleep apnea or narcolepsy.

Mitchell reported having thoughts of suicide but no plan.  Mitchell reported that

she never tried Provigil because she did not want to take more medication.  Mental

status examination showed Mitchell to have poor eye contact with a dysphoric and

tearful affect.  Dr. Robinson noted Mitchell's insight and judgment to be poor.  Dr.

Robinson continued in his diagnoses and assigned a current GAF score of 50.[6]  Dr.

Robinson instructed Mitchell to increase her dosage of Lamictal.  (Tr. 225-26.)

---

[6]  A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

On June 22, 2009, Mitchell reported to Dr. Robinson that she no longer felt depressed.  Mitchell reported continued irritability but with no threatening or violent behavior.  Mitchell reported feeling less anxious but with continued paranoia.  Mitchell reported taking a math class at the community college for the fourth time and having scored ninety percent on a recent test.  Mitchell reported doing her homework as assigned but that she had difficulty staying in class or paying attention for any length of time.  Mitchell reported smoking less marijuana than in the past.  Mental status examination showed Mitchell to have poor eye contact with a dysphoric affect.  Mitchell denied having suicidal or homicidal thoughts.  Dr. Robinson noted Mitchell's insight and judgment to be limited.  Dr. Robinson continued in his diagnoses and GAF score of 50, noting Mitchell's prominent problems to be anxiety, fear, and paranoia.  Dr. Robinson prescribed a trial dose of Nuvigil for sleep disorder.  Dr. Robinson also discussed with Mitchell the possibility of ECT because of her lack of response to medication.  (Tr. 227-28.)

Mitchell's mother called Dr. Robinson on June 26, 2009, to report an increase in Mitchell's agitation, weepiness, and fear of driving.  Dr. Robinson adjusted Mitchell's dosage of Abilify.  ( Tr. 228.)

Mitchell returned to Dr. Robinson on July 7, 2009, and reported feeling better after her medication adjustment.  Dr. Robinson noted that Mitchell never took Nuvigil.  Mitchell reported that she earned mostly B's in her math class and

was doing well.  Mental status examination was unchanged from Mitchell's last visit.  Dr. Robinson assigned a current GAF score of 55, noting apparent improvement.  (Tr. 229-30.)

On July 24, 2009, Mitchell visited Dr. Robinson and reported that she had a job as a cashier at a restaurant.  Mitchell reported doing well but feeling overwhelmed during the lunchtime rush.  Mitchell's parents reported that things were going well overall.  Dr. Robinson noted that Mitchell had not yet begun Nuvigil.  Mental status examination showed Mitchell to have poor eye contact with a euthymic affect.  Dr. Robinson noted Mitchell's insight and judgment to be better.  Dr. Robinson continued in his diagnoses and GAF score, noting Mitchell to be doing well.  (Tr. 231-32.)

Mitchell returned to Dr. Robinson on August 6, 2009, and reported having good self-esteem and not feeling depressed.  Mitchell earned a C+ in her math class and enrolled in three classes for the upcoming fall semester.  Mitchell reported that she was fired from her job after two days.  Mental status examination showed Mitchell to have good eye contact with a euthymic affect.  Dr. Robinson observed Mitchell to be mildly restless.  Dr. Robinson noted Mitchell's insight and judgment to be better.  Dr. Robinson encouraged Mitchell to take Nuvigil to help with energy, attention, and concentration.  (Tr. 233-34.)

On August 20, 2009, Mitchell reported to Dr. Robinson that her boyfriend

had moved out after she hit him.  Mitchell reported that she briefly lived at a house where a lot of drug use occurred and that she stopped taking her medication, after which she did poorly.  She reported having only recently recovered.  Dr. Robinson noted Mitchell to remain somewhat irritable and impatient.  Mitchell reported her mood to generally be better but that she continued to have some mood swings.  Mitchell had not yet started Nuvigil.  Mental status examination remained largely unchanged.  Dr. Robinson noted Mitchell's frequent noncompliance with her medication and opined that such circumstance may account for her mood instability.  Dr. Robinson discussed counseling with Mitchell for help with anger. (Tr. 235-36.)

Mitchell returned to Dr. Robinson on September 3, 2009, and reported recent depression and being tired most of the time.  Mitchell expressed her desire to reconcile with her boyfriend.  Mitchell reported that Nuvigil helped her focus at school, and Mitchell's mother reported that Mitchell was more organized and helpful at home.  Mental status examination showed Mitchell to have fair eye contact with a dysphoric and teary affect.  Dr. Robinson noted Mitchell's insight and judgment to be better.  Dr. Robinson continued in his diagnoses and GAF score and instructed Mitchell to continue with her current medications.  (Tr. 236-37.)

On September 17, 2009, Mitchell reported to Dr. Robinson that she was a

"bad kid" and that she smoked marijuana every day, which caused her to become sleepy and sometimes unable to stay awake.  Mitchell's mother stopped giving Nuvigil because of manic symptoms, but Mitchell continued to be irritable. Mitchell reported missing a lot of classes because she often overslept.  Dr. Robinson noted Mitchell's self-esteem to be extremely low.  Mental status examination was essentially unchanged, but Mitchell was noted to be extremely negativistic.  Dr. Robinson continued in his diagnoses and assigned a current GAF score of 50.  Dr. Robinson instructed Mitchell to restart Nuvigil at a lower dose and encouraged Mitchell to abstain from marijuana.  Dr. Robinson also discussed the possibility of ECT.  (Tr. 239-40.)

On October 1, 2009, Mitchell reported to Dr. Robinson that she was depressed, irritable, belligerent, and having rapid mood swings.  Mitchell reported throwing and hitting things on a daily basis.  Mitchell reported missing class because of difficulty waking up in the morning.  Mitchell reported that she had an upcoming job interview.  Mitchell reported that she decreased her use of marijuana and was currently smoking only three bowls a day.  Dr. Robinson noted Mitchell not to be taking medication regularly, having missed all of her morning medications for two weeks.  Mental status examination showed Mitchell to have good eye contact with a euphoric affect.  Mitchell was noted to be outgoing, very pleasant, and somewhat silly – smiling continuously.  Mitchell was logical and

sequential and spoke with a regular rhythm and rate.  Mitchell continued to be extremely negativistic.  Mitchell's insight and judgment were better.  Dr. Robinson continued in his GAF score of 50, noting Mitchell to continue to be quite symptomatic with depression and irritability.  Dr. Robinson again recommended ECT.  Dr. Robinson adjusted Mitchell's current medications and prescribed Topamax for headaches.  (Tr. 241-42.)

On October 12, 2009, Mitchell visited Dr. Robinson who noted Mitchell to be working about twenty hours a week.  Mitchell reported that she had not missed work but continued to miss a lot of classes because of her difficulty waking up in the morning.  Mitchell reported taking her medications every day and feeling less irritable, depressed, and agitated.  Mitchell also reported having less severe mood swings.  Mental status examination showed Mitchell to have good eye contact with a euthymic affect.  Mitchell was noted to be minimally tremulous and easily distracted.  Mitchell was logical and sequential and spoke with a regular rhythm and rate.  She denied having any suicidal or homicidal thoughts, and her insight and judgment were better.  Dr. Robinson continued in his diagnoses and assigned a GAF score of 52, noting Mitchell to be a bit better after adjusting her medication. Dr. Robinson instructed Mitchell to discontinue Nuvigil and to increase Topamax. (Tr. 243-44.)

On October 29, 2009, Dr. Robinson noted Mitchell to be feeling better but to

have mood instability and paranoia.  Mitchell reported that she attended classes every day that week and was currently passing the two classes in which she was enrolled.  Mental status examination was unchanged.  Dr. Robinson assigned a current GAF score of 55 and continued to discuss ECT.  (Tr. 245-46.)

On November 12, 2009, Mitchell reported to Dr. Robinson that she was fired from her job because she missed work and was anxious.  Mitchell reported that she forgot to take her medication.  Mitchell requested Adderall inasmuch as she noted improvement after she took a friend's medication.  Mental status examination remained unchanged.  Dr. Robinson prescribed Vyvanse.  (Tr. 247-48.)

On November 25, 2009, Mitchell visited Dr. Robinson and reported having temper outbursts, rapid mood swings, irritability, and frequent crying spells.  Mitchell reported being too anxious and agitated to go to school.  Mitchell reported that she stopped taking Haloperidal and Lorazepam because she did not want to be "knocked out."  Mitchell's mother reported that she did not permit Mitchell to start Vyvanse.  Mental status examination showed Mitchell to have good eye contact with a restricted affect.  Mitchell denied having any suicidal or homicidal thoughts.  Dr. Robinson noted Mitchell's insight and judgment to be limited.  Dr. Robinson assigned a current GAF score of 48, noting Mitchell to be more anxious and agitated with noncompliance being a significant problem.  Dr. Robinson adjusted Mitchell's current medications and added Saphris to her medication regimen.  (Tr.

249-50.)

Mitchell returned to Dr. Robinson on December 10, 2009, and reported being much less depressed.  Dr. Robinson noted Mitchell not to have taken any Saphris at her mother's suggestion but otherwise had not missed any dose of medication.  Mitchell reported continued temper outbursts and occasional symptoms suggestive of panic attacks.  Mental status examination was unchanged.  Dr. Robinson assigned a current GAF score of 52, noting Mitchell to be doing better since restarting her medication.  Dr. Robinson prescribed Diazepam and referred Mitchell for counseling.  (Tr. 251-52.)

On December 22, 2009, Mitchell's parents reported to Dr. Robinson that Mitchell had extremely rapid mood swings and was extremely demanding.  They reported that Mitchell earned a C in her English class but expressed concern that Mitchell may have reached maximum improvement.  Dr. Robinson discussed the possibility of Mitchell applying for disability, noting that she was quite resistant to treatment despite years of aggressive medication treatment.  Dr. Robinson opined that Mitchell was "totally and permanently disabled."  (Tr. 253-54.)

Mitchell visited Dr. Robinson on January 11, 2010, and reported feeling less depressed, having less severe mood swings, and being less irritable.  Mitchell reported disturbed sleep and continued paranoia.  Dr. Robinson noted Mitchell to be taking her medication as prescribed.  Mitchell reported that she planned to quit

smoking tobacco and marijuana as a new year's resolution.  Mental status

remained unchanged.  Dr. Robinson assigned a GAF score of 54, noting Mitchell

to be better but still psychotic and quite symptomatic.  Dr. Robinson prescribed

Geodon and discussed the possibility of psychotherapy.  (Tr. 255-56.)

Mitchell visited Dr. Robinson on January 25, 2010, and reported feeling

ambivalent about filing for disability.  Dr. Robinson noted that Mitchell had been

fired from every minimum wage job within a week of starting.  Mitchell reported

improved symptoms upon starting Geodon but that she worsened during the

previous week.  Mitchell also reported recent issues with her boyfriend.  Mental

status examination showed Mitchell to have good eye contact with a dysphoric and

teary affect.  She was mildly restless.  Dr. Robinson noted Mitchell to be logical

and sequential and to speak with regular rate and rhythm.  Dr. Robinson noted

Mitchell's insight and judgment to be poor.  Dr. Robinson continued in his

diagnoses and assigned Mitchell a GAF score of 52.  Dr. Robinson shared with

Mitchell his opinion that she was totally and permanently disabled because of her

"extremely serious psychiatric disorder."  Dr. Robinson increased Mitchell's

dosage of Geodon.  (Tr. 257-58.)

On February 10, 2010, Mitchell reported to Dr. Robinson that she felt

Geodon was working because she did not feel depressed and did not have mood

swings.  Mitchell reported continued symptoms of paranoia.  Mental status

examination was unchanged.  Dr. Robinson assigned a GAF score of 53, noting Mitchell to continue to slowly improve.  Dr. Robinson instructed Mitchell to increase her dosage of Geodon.  (Tr. 259-60.)

On February 24, 2010, Mitchell returned to Dr. Robinson and reported that her mood was more stable than it had been for years and that she felt more confident.  Dr. Robinson noted that Mitchell regularly attended classes but that she complained of poor memory with poor recall.  Mitchell reported that she had little difficulty focusing.  Mitchell also reported a marked decrease in her marijuana use. Mental status examination showed Mitchell to have good eye contact with a calm and euthymic affect.  Dr. Robinson noted Mitchell's insight and judgment to be poor.  Dr. Robinson assigned a current GAF score of 60, noting Mitchell to be doing quite well.  Dr. Robinson observed Mitchell to be the "most calm and stable that [he'd] ever seen her" but opined that she remained disabled because of her psychiatric disorder.  Dr. Robinson instructed Mitchell to decrease her dosage of Topamax.  Dr. Robinson prescribed Benztropine for possible EPS symptoms.  (Tr. 261-62.)

On March 8, 2010, Mitchell reported to Dr. Robinson that she felt depressed and angry.  Mitchell's parents reported that Mitchell was more agitated during the previous week to ten days and was slurring her words.  Mitchell continued to complain of paranoid thoughts.  Dr. Robinson noted that Mitchell had not yet taken

Benztropine but continued to smoke marijuana every day.  Mental status
examination showed Mitchell to have fair eye contact with a calm and euthymic
affect.  Dr. Robinson noted Mitchell to slur her words and appear very sleepy.  Dr.
Robinson also noted, however, that Mitchell was logical and sequential and spoke
with a regular rate and rhythm.  Mitchell denied any thoughts of suicide or
homicide.  Dr. Robinson noted Mitchell's insight and judgment to be poor.  Dr.
Robinson assigned a current GAF score of 50.  Dr. Robinson noted that Mitchell's
symptoms of drooling, slurred speech, sleepiness, impaired memory, and
incontinence may be related to medication side effects and opined that Mitchell
may be overmedicated.  Medication adjustments were considered.  (Tr. 263-64.)

Mitchell returned to Dr. Robinson on March 22, 2010, and reported having
mood swings, irritability, continued paranoia, and occasional anxiety.  Mitchell's
mother reported her belief that Mitchell was "taking leaps backwards."  Mental
status examination was unchanged.  Dr. Robinson assigned a GAF score of 45,
noting that Mitchell was "definitely worse" than one week before.  Dr. Robinson
adjusted Mitchell's dosages of Geodon and Abilify.  Mitchell's additional
medications at that time included Lithobid, Topamax, Lamictal, Diazepam, and
Benztropine.  (Tr. 265-66.)

Mitchell returned to Dr. Robinson on April 5, 2010, and reported rapid mood
swings occurring daily.  Mitchell reported having impulsively threatened suicide so

that others would feel bad for her, but that she intended never to follow through with her threats. Mitchell continued to complain of interrupted sleep. Mental status examination showed poor eye contact with a dysphoric and teary affect. Dr. Robinson noted Mitchell's insight and judgment to be poor. Dr. Robinson continued in his diagnoses of ADHD; bipolar disorder, most recent episode depressed; OCD; and cannabis dependence. Dr. Robinson continued to assign a GAF score of 45. Dr. Robinson adjusted Mitchell's dosage of Geodon and determined to return to the regimen previously prescribed that helped Mitchell to feel better. (Tr. 267-68.)

On April 19, 2010, Mitchell reported to Dr. Robinson that she felt good and was in a good mood. Mitchell reported that she smoked marijuana almost every night and ate fast food most nights with her friends. Mitchell continued to report mood swings and irritability and that she had difficulty remembering things when she "goes off." Mitchell's mother reported that Mitchell heard voices and footsteps, and Mitchell expressed reluctance to discuss the matter fearing it would increase the frequency of these episodes. Dr. Robinson noted that Mitchell was taking one course at the community college. Mental status examination showed Mitchell to have good eye contact with a euthymic affect. Dr. Robinson noted Mitchell's insight and judgment to be limited. Dr. Robinson assigned a GAF score of 45, noting Mitchell to be manic with prominent paranoia and episodes of

irritability.  Dr. Robinson adjusted Mitchell's dosage of Geodon and instructed Mitchell to discontinue Topamax.  (Tr. 269-70.)]

On May 3, 2010, Mitchell reported to Dr. Robinson that she continued to be paranoid and have unreasonable fears.  Mitchell reported that she could not sit still and focus while in class but that she was productive while taking Vyvanse. Mitchell reported that she continued to smoke marijuana every day.  Mental status examination showed Mitchell to have good eye contact with a restricted affect. Mitchell was noted to be calm.  Dr. Robinson noted Mitchell's insight and judgment to be limited.  Dr. Robinson continued in his diagnoses and GAF score, noting that Mitchell was doing better than before with continued paranoia but resolved hallucinations.  (Tr. 271-72.)

On May 15, 2010, Mitchell underwent a consultative psychological evaluation for disability determinations.  Mitchell reported to Dr. Rosemarie Kugler that she had bipolar disorder, ODD, and ADHD.  Dr. Kugler noted Mitchell's history to include one psychiatric hospitalization and threats to kill others, including her mother.  Dr. Kugler noted Mitchell's current medications to be Lithium, Abilify, Lamictal, Geodon, Diazepam, and Benztropine.  Mitchell reported that she currently felt anxious, irritable, useless, and fearful.  Mitchell also reported that she had no energy, had difficulty controlling her temper, had no ambition, and had difficulty concentrating.  Mitchell reported feeling sad most of

the time.  Mitchell reported that she had been fired from all of her previous jobs

within hours or weeks of being hired.  Mitchell reported that she smoked marijuana

every other day to calm her and that she began smoking marijuana when she was a

senior in high school.  Mitchell reported that she no longer got "high" from

marijuana.  Mental status examination showed Mitchell to appear drowsy and

lethargic.  Mitchell was oriented times three, and Dr. Kugler noted no apparent

disturbances in attention and concentration.  Mitchell had good eye contact, and

her affect was constricted.  Mitchell's mood was apathetic.  Mitchell was

cooperative and forthcoming during the evaluation.  Dr. Kugler noted no apparent

disturbances in memory.  Dr. Kugler estimated that Mitchell had average

intellectual ability.  Dr. Kugler noted Mitchell's thought processes to be intact and

goal directed; and Mitchell's judgment, insight, and reasoning were adequate.

Mitchell described her daily functioning as "lazy."  Mitchell reported that she

sometimes performed household chores but was unwilling to do so.  As to her

social functioning, Mitchell reported getting mad quickly but that she socialized

with two friends.  Dr. Kugler noted that Mitchell had the capacity to interact

independently but that her moods and irritability could interfere with this.  Dr.

Kugler noted Mitchell to be able to attend to tasks and concentrate despite

appearing drowsy.  Mitchell reported to Dr. Kugler that she had an average of four

major episodes of decompensation each year that interfered with her adaptive

functioning.  Upon conclusion of the evaluation, Dr. Kugler diagnosed Mitchell with bipolar-I disorder, most recent episode depressed; and cannabis dependence. Dr. Kugler assigned a current GAF score of 55 and opined that Mitchell's highest GAF score in the past year was 55.  Dr. Kugler determined Mitchell's prognosis to be guarded and opined that she could not manage her own funds.  (Tr. 176-80.)

Mitchell returned to Dr. Robinson on May 17, 2010, and reported being happy, having fun, going to class, and being able to study.  She reported that she was passing her reading class.  Mitchell reported being up late and feeling tired every day.  Mitchell reported that taking Vyvanse four times a week was effective for her.  Mitchell reported, however, that her parents were recently away for a weekend, and she was unable to handle any small crisis.  Mitchell reported that she called and texted her parents almost continuously during that time.  Mental status examination was unchanged.  Dr. Robinson continued in his diagnoses and current GAF score of 45, noting that Mitchell continued to be quite symptomatic and extremely dependent upon her parents.  (Tr. 273-74.)

On May 26, 2010, Dr. James W. Morgan, a medical consultant for disability determinations, completed a Mental Residual Functional Capacity (RFC) Assessment wherein he opined that, in the domain of Understanding and Memory, Mitchell was moderately limited in her ability to understand and remember detailed instructions, but was not otherwise limited.  In the domain of Sustained

Concentration and Persistence, Dr. Morgan opined that Mitchell was moderately limited except that she experienced no limitations in her ability to carry out very short and simple instructions and make simple work-related decisions.  In the domain of Social Interaction, Dr. Morgan opined that Mitchell was moderately limited in her ability to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was not otherwise limited.  In the domain of Adaptation, Dr. Morgan determined Mitchell to be moderately limited in her ability to respond appropriately to changes in the work setting and in her ability to set realistic goals or make plans independently of others, but was not otherwise limited.  (Tr. 181-83.)

In a Psychiatric Review Technique Form completed May 26, 2010, Dr. Morgan opined that Mitchell's ADHD, learning disability, depression, anxiety, bipolar disorder, and cannabis dependence caused mild restrictions in Mitchell's activities of daily living; moderate restrictions in maintaining social functioning and with maintaining concentration, persistence, or pace; and did not result in any repeated, extended episodes of decompensation.  (Tr. 184-95.)

On June 1, 2010, Mitchell reported to Dr. Robinson that she felt better when she worked out with her personal trainer and that she was more stable on the higher dose of Geodon.  Mitchell reported feeling happier and shared her excitement

about going to a casino that night with her friends to celebrate her birthday. Mitchell reported that her paranoia and sleep habits had improved, but she felt she was obsessing about things.  Mental status examination showed Mitchell to have good eye contact and a more euthymic affect.  Mitchell was calm and more optimistic.  Dr. Robinson noted Mitchell to have limited insight and judgment.  Dr. Robinson assigned a current GAF score of 50, noting Mitchell to continue to be symptomatic but with noted improvement.  Dr. Robinson noted Mitchell to remain psychotic and paranoid and completely unable to live independently.  Mitchell was instructed to continue with her current medications.  (Tr. 275-76.)

Mitchell returned to Dr. Robinson on June 29, 2010, and reported being tired despite getting seven to twelve hours of sleep at night.  Mitchell reported regular exercise by working with a personal trainer twice a week.  Mitchell reported continued mood swings and periods of irritability, albeit improved.  Mitchell reported having "rage attacks" that lasted from fifteen to sixty minutes and that anything could "set her off" during these periods.  Mitchell stopped taking daytime doses of her medication for over a week but recently returned to taking her medication as prescribed.  Mitchell reported continued use of marijuana.  Mental status examination was unchanged.  Dr. Robinson continued with his diagnoses and GAF score, noting Mitchell to be stable because she resumed taking her medications.  Dr. Robinson noted Mitchell to be unstable during those periods

when she was noncompliant with her medication.   (Tr. 277-78.)

On July 12, 2010, Mitchell reported to Dr. Robinson that her mood was more stable and that things were "going okay."  Mitchell reported going to the casino once or twice a week and that she liked to spend money.  Mitchell's mother reported that Mitchell had temper outbursts two or three times a day but not with most of her friends.  Mental status examination showed Mitchell's eye contact to be fair with a restricted affect.  Dr. Robinson noted Mitchell to be lethargic and appear sleepy.  Mitchell's insight and judgment were noted to be limited.  Dr. Robinson continued in his diagnoses and GAF score.  Dr. Robinson encouraged Mitchell to find an enjoyable activity to help with boredom.  Dr. Robinson instructed Mitchell to restart Vyvanse.  (Tr. 279-80.)

Mitchell visited Dr. Robinson on July 26, 2010, and reported continued fear of death and of other people dying.  Mitchell's mother reported that the mood swings were terrible the previous week.  Dr. Robinson noted Mitchell to work with her trainer three times a week and was somewhat less tired.  Mental status examination was unchanged. Dr. Robinson continued in his diagnoses and GAF score, noting Mitchell to remain paranoid and obsessional.  Dr. Robinson recommended counseling.  Mitchell expressed concern regarding memory loss if she were to undergo ECT.  (Tr. 281-82.)

On August 9, 2010, Mitchell reported to Dr. Robinson that she was good but

- 36 -

felt depressed.  Mitchell also reported being paranoid and fearful all of the time.

Mitchell reported that she often avoided sleep for fear of being killed.  Mitchell

also reported that she enjoyed gambling but did not excessively engage in the

activity.  Mitchell's mother reported that Mitchell experienced cycling moods

which included being "hyper-happy" and hearing voices.  Mental status

examination showed Mitchell to have good eye contact with a calm and restricted

affect.  Mitchell was not lethargic.  Dr. Robinson noted Mitchell's insight and

judgment to be limited.  Dr. Robinson continued in his diagnoses of ADHD,

bipolar disorder, OCD, and cannabis dependence.  Dr. Robinson also continued to

assign a GAF score of 50.  Dr. Robinson noted Mitchell's condition to essentially

be unchanged.  ECT procedures were discussed.  (Tr. 378.)

Mitchell returned to Dr. Robinson on August 26, 2010, and reported

continued irritability but that she felt happier.  Mitchell reported that she stopped

smoking marijuana three days prior and was exercising regularly.  Mitchell's

mother reported continued mood changes and paranoia.  Mental status examination

showed Mitchell to have good eye contact with an animated and cheerful affect.

Dr. Robinson noted Mitchell to listen to her mother without getting angry.

Mitchell's insight and judgment were limited.  Dr. Robinson continued in his

diagnoses and GAF score, noting Mitchell to be more irritable given her recent

attempt to stop smoking marijuana and cigarettes.  (Tr. 379.)

From September 1 to September 17, 2010, Mitchell underwent six outpatient ECT treatments at St. John's Mercy Medical Center.  (Tr. 322-72.)  In the interim, on September 9, 2010, Dr. Robinson noted Mitchell to be doing better since starting ECT, with less agitation and anxiousness.  Mitchell also reported having fewer paranoid thoughts and auditory hallucinations, as well as improved memory.  Mitchell reported continued use of marijuana.  Inasmuch as ECT was effective, Dr. Robinson ordered that Mitchell undergo such treatments three times a week.  (Tr. 380-81.)

Mitchell returned to Dr. Robinson on September 23, 2010, who noted that Mitchell refused to undergo two ECT treatments that week.  Mitchell reported that she felt like she was going to die.  Mitchell reported having a severe headache with one of the treatments.  Dr. Robinson noted Mitchell to be less paranoid and anxious and to be much less agitated.  Mitchell reported improved memory.  Dr. Robinson continued in his diagnoses of Mitchell and assigned a current GAF score of 60, noting Mitchell to have clearly improved.  Dr. Robinson encouraged Mitchell to continue with ECT treatments in order to consolidate the gains and minimize the risk of relapse, but Mitchell declined.  Dr. Robinson noted Mitchell's current medications to be Vyvanse, Abilify, Geodon, Lamotrigine, Diazepam, and Benztropine.  (Tr. 383-84.)

On October 7, 2010, Mitchell reported to Dr. Robinson that she was not

depressed and was happier.  Mitchell reported having less aggressive or severe mood swings as well as decreased paranoia.  Mitchell reported that she recently went to a bar and had a good time.  Mental status examination showed Mitchell to have good eye contact and a euthymic affect.  Dr. Robinson noted Mitchell's insight and judgment to be better.  Dr. Robinson continued in his diagnoses and assigned a current GAF score of 65,[7] noting the difference in Mitchell to be "striking."  Dr. Robinson discussed with Mitchell the possibility of adjusting medication to help with anxiety on days that Mitchell was scheduled to undergo ECT treatment.  (Tr. 385-86.)

On October 28, 2010, Mitchell reported to Dr. Robinson that she felt unhappy much of the time and that her friends told her that she had regressed. Mitchell acknowledged that she should undergo more ECT treatments but stated that she did not want to.  Mitchell reported that she smoked all day, had difficulty falling asleep at night, and was experiencing increased paranoia.  Dr. Robinson continued in his current diagnoses and GAF score of 65, but noted Mitchell to have relapsed.  Mitchell refused continued ECT treatments as well as suggested treatment with Vyvanse and Lithium.  Dr. Robinson increased Mitchell's dosage of

---

[7] A GAF score of 61 to 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Geodon.  (Tr. 387-88.)

On November 11, 2010, Mitchell reported to Dr. Robinson that she was not irritable, had no racing thoughts, and felt good.  Mitchell reported going out to clubs with friends and that she enrolled in a reading class for the spring.  Dr. Robinson continued in his diagnoses and assigned a current GAF score of 60, noting Mitchell to be mildly manic but not psychotic and much less paranoid. Mitchell continued to decline ECT treatment.  (Tr. 389-90.)

On November 23, 2010, Dr. Robinson noted Mitchell to be doing extremely well overall.  Mitchell reported that she no longer drank or consumed drugs. Mitchell also reported that her temper had improved and that she did not feel anxious or worried.  Mitchell reported staying up until 4:00 a.m. playing or watching friends play video games but that she did not feel tired during the day. Mental status examination showed good eye contact and a euthymic affect.  Dr. Robinson noted Mitchell's insight and judgment to be better.  Dr. Robinson continued in his diagnoses and GAF score.  (Tr. 391-92.)

Mitchell returned to Dr. Robinson on December 7, 2010, and reported recent irritability, disturbed sleep, and negative thoughts.  Mitchell denied having any suicidal thoughts.  Mitchell reported that she wanted to restart her exercise program.  Mitchell's parents reported that she was doing better.  Dr. Robinson continued in his diagnoses and GAF score, noting Mitchell to continue to do well

but to exhibit some explosiveness as well as anxiousness.  Dr. Robinson opined

that Mitchell may be somewhat more depressed.  Mitchell continued to decline

ECT treatments.  Dr. Robinson prescribed Trileptal as a mood stabilizer.  (Tr. 393-

94.)

On December 21, 2010, Dr. Robinson noted that Mitchell remained

improved and was more stable.  Mitchell reported feeling no different but being

less irritable.  Mitchell reported less fearfulness but continued to have intermittent

paranoia.  Mitchell also reported having mood swings throughout the day.  Dr.

Robinson noted Mitchell to be compliant with her medication but that her Trileptal

was never filled because of potential adverse drug interactions.  Mitchell indicated

her desire to continue with her current medications and to undergo ECT treatments

if her condition deteriorated.  (Tr. 395-96.)

On January 18, 2011, Dr. Robinson noted Mitchell to continue to improve.

Mitchell continued to report having mood swings but that she felt pretty good and

was not too depressed.  Dr. Robinson noted her to be "hypertalkative."  Dr.

Robinson added Vyvanse to Mitchell's medication regimen.  (Tr. 397-98.)

On February 15, 2011, Mitchell reported to Dr. Robinson that she was able

to focus at school and study while taking Vyvanse but that she became more

irritable.  Mitchell described a recent episode whereby she chased her boyfriend

through a parking lot, and the police came.  Dr. Robinson noted Mitchell to have

stopped taking Vyvanse and that she returned to baseline, but that she remained paranoid at baseline.  Dr. Robinson instructed Mitchell to take a decreased dose of Vyvanse and only on school days.  (Tr. 399-400.)

Mitchell returned to Dr. Robinson on March 1, 2011, and reported being anxious, very angry, and having mood swings and negative thoughts.  Mitchell reported having recently lost $40.00 at a casino.  Mitchell reported that she argued with her mother and believed that she had no friends.  Dr. Robinson noted Mitchell's self-esteem to be low.  Mental status examination showed Mitchell to be somewhat agitated and anxious with a dysphoric and teary affect.  Mitchell was not hypertalkative or circumstantial, and Dr. Robinson noted her insight and judgment to be better.  Dr. Robinson noted Mitchell not to have taken any Vyvanse since her last visit.  Dr. Robinson determined to prescribe Trileptal.  Dr. Robinson assigned a current GAF score of 55.  (Tr. 401-02.)

On March 11, 2011, Dr. Robinson completed a Mental Assessment Of Ability To Do Work-Related Activities in which he opined that Mitchell had poor or no ability to make occupational adjustments, which included following work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, and concentration.  Dr. Robinson further opined that Mitchell had poor or no ability to make performance adjustments, which included the ability to understand,

remember and carry out complex, detailed, or simple job instructions.  Finally, Dr. Robinson opined that Mitchell had poor or no ability to make personal-social adjustments, including maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability.  (Tr. 377.)

Mitchell returned to Dr. Robinson on March 17, 2011, and reported feeling depressed and having continued feelings of paranoia, albeit to a lesser extent. Mitchell reported being demanding but not irritable.  Dr. Robinson noted Mitchell to be regularly attending school.  Mitchell reported occasional marijuana use.  Dr. Robinson noted Mitchell not to have taken the Trileptal.  Dr. Robinson adjusted Mitchell's dose of Lamotrigine and Abilify.  (Tr. 407.)

On March 31, 2011, Mitchell reported to Dr. Robinson that she had not been emotional and was having good days.  Mitchel reported having daytime sleepiness and missing some classes because of this.  Dr. Robinson assigned a GAF score of 60, noting Mitchell to be doing well overall and to be more calm and stable than the last visit.  Dr. Robinson instructed Mitchell to continue with her current medications as prescribed.  (Tr. 408-09.)

On April 14, 2011, Dr. Robinson prescribed Zaleplon for insomnia in response to complaints that Mitchell experienced rapid mood cycles triggered by lack of sleep.  During a visit on April 28, 2011, Dr. Robinson noted that Mitchell

never filled the prescription.  Mitchell reported at that time that she smoked marijuana to help her sleep.  Mitchell reported feeling goofy and "high on life." Mitchell reported having difficulty attending class regularly and paying attention in class.  Mental status examination showed Mitchell to be energetic and talkative. Mitchell denied having hallucinations.  Dr. Robinson noted Mitchell's insight and judgment to be fair.  Dr. Robinson continued in his diagnoses and GAF score, noting Mitchell to continue to cycle between manic and depressive moods.  Dr. Robinson prescribed Vyvanse.  On May 12, 2011, Dr. Robinson noted Mitchell to be about the same.  (Tr. 411-16.)

On May 26, 2011, Mitchell reported to Dr. Robinson that her mood was stable and that her mood swings had decreased.  Mitchell reported that she was travelling out of state the following week with a friend and their family.  Dr. Robinson assigned a GAF score of 65 and instructed Mitchell to continue with her current medications.  (Tr. 417-18.)

On June 6, 2011, Mitchell reported to Dr. Robinson that she was depressed and had poor motivation.  Dr. Robinson noted Mitchell to be upset with her body image.  Dr. Robinson advised Mitchell that smoking marijuana may stimulate her appetite.  (Tr. 419-20.)  On June 23, 2011, Dr. Robinson noted Mitchell to be generally doing well.  Mitchell reported that she was enrolling in more classes at the community college.  Dr. Robinson added reading comprehension learning

disability as a diagnosis.  Dr. Robinson noted that Mitchell never increased her dosage of Abilify as previously planned.  Dr. Robinson instructed Mitchell to continue with her current medications.  (Tr. 421.)

Mitchell returned to Dr. Robinson on July 21, 2011, and reported that she was somewhat frustrated.  Mitchell's mother reported that Mitchell was more argumentative and negative.  Dr. Robinson noted Mitchell to be unchanged and continued in his diagnoses and GAF score of 65.  (Tr. 422-23).

On August 4, 2011, Mitchell reported to Dr. Robinson that she was exercising and felt good.  Dr. Robinson continued in his diagnoses and GAF score. (Tr. 424-25.)  On August 18, 2011, Mitchell reported to Dr. Robinson that she stopped smoking marijuana but has since had difficulty sleeping.  Mitchell reported playing card games with her friends but continued to feel intolerant of others.  Mitchell reported that she was taking Vyvanse and was not as irritable as before.  Dr. Robinson determined that Mitchell was doing reasonably well and continued in his diagnoses and GAF score.  (Tr. 427-28.)

Mitchell returned to Dr. Robinson on September 1, 2011, and reported that her temper had worsened but that she occasionally smoked marijuana to calm her. Mitchell reported that taking Vyvanse before school helped, but that she continued to have a problem with dyslexia.  Dr. Robinson continued in his diagnoses and GAF score.  (Tr. 430-31.)  On September 8, 2011, Mitchell reported to Dr.

Robinson that she continued to be paranoid, feeling that someone was going to shoot or attack her.  Mitchell reported that she smoked marijuana to calm her.  Dr. Robinson noted Mitchell to be more stable than in the past but continued to be paranoid and psychotic, which regularly affected her behavior.  Dr. Robinson suggested that Mitchell begin taking Clozapine given the severity of symptoms, but Mitchell declined.  (Tr. 433-34.)

Mitchell visited Dr. Robinson on October 17, 2011, and reported that she was less agitated but continued to be paranoid.  Mitchell reported that she continued to smoke marijuana two or three times a week because it calmed her. Dr. Robinson continued in his diagnoses and assigned a GAF score of 65.  (Tr. 440-41.)

On that same date, October 17, 2011, Dr. Robinson completed an Assessment for Social Security Disability Claim in which he reported that Mitchell had a history of frequent and severe mood swings, impaired cognition, paranoia, fatigue, low energy, poor frustration tolerance, and severe anxiety.  Dr. Robinson reported Mitchell's diagnoses to be ADHD, bipolar disorder – current episode depressed, OCD, and reading comprehension learning disability; and that her medications were Vyvanse, Lamotrigine, Benztropine, Abilify, Geodon, and Diazepam.  Dr. Robinson opined that Mitchell's mental impairment affected her ability to work in that she "remains psychotic [and] paranoid which affects her

behavior on a regular basis.  She remains intolerant of others.  She is very restless [and] continues to move almost constantly."  (Tr. 438.)

In a Mental Assessment Of Ability To Do Work-Related Activities completed October 17, 2011, Dr. Robinson continued to opine that Mitchell had poor or no ability to make occupational adjustments or performance adjustments. Dr. Robinson further opined that Mitchell had poor or no ability to make personal-social adjustments, except that Mitchell had a fair ability to maintain personal appearance.  (Tr. 439.)

## IV.  School Records Before the ALJ

In May 2004, at fifteen years of age, Mitchell underwent the Woodcock-Johnson Psycho-Educational Battery Revised Tests of Achievement and scored in the average range for broad reading and broad written language, and in the low average range for broad mathematics.  (Tr. 150-52.)

Mitchell graduated from high school in May 2007 with a cumulative grade point average of 1.645.  During Mitchell's senior year in high school, she earned grades ranging from a B in physical education, to D's and F's in economics, math, and reading.  (Tr. 136.)  Mitchell participated in an Individual Education Program because of her educational diagnoses of ADHD, learning disability – math reasoning, adjustment disorder with mixed anxiety and depression, and bipolar disorder.  Mitchell was placed in the regular classroom 100 percent of the time.

(Tr. 139-49.)

Mitchell's transcript from St. Louis Community College dated September 15, 2011, shows Mitchell to have earned twelve credit hours and to have a cumulative GPA of 2.50.  During the Fall 2009 semester, Mitchell withdrew from two classes, earned a C in Introduction to College Writing, and earned F's in Developmental Reading and Reading Lab.  During the Spring 2010 semester, Mitchell withdrew from three classes and earned B's in Developmental Reading and Reading Lab.  During the Spring 2011 semester, Mitchell earned a B in Reading Improvement.  (Tr. 173.)

## V.  The ALJ's Decision

The ALJ found that Mitchell had not engaged in substantial gainful activity since February 16, 2010, the protected filing date of her application for benefits. The ALJ found Mitchell's depression, anxiety, learning disability, cannabis dependence, ADHD, OCD, and obesity to be severe impairments, but that Mitchell did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ determined that Mitchell had the RFC to perform the exertional demands of light work and could understand, remember, and carry out at least simple instructions and non-detailed tasks, and maintain regular attendance and work presence without special supervision.  The ALJ determined Mitchell to be limited

in her RFC in that she should not work in a setting that included constant/regular contact with the general public, and should not perform work that required more than infrequent handling of customer complaints.  The ALJ found Mitchell to have no past relevant work.  Considering Mitchell's age, education, work experience, and RFC, the ALJ determined that Mitchell was able to perform jobs that exist in significant numbers in the national economy, and specifically, housekeeper/cleaner and hand presser.  The ALJ thus found Mitchell not to be under a disability since February 16, 2010.  (Tr. 9-23.)

## VI.  Discussion

To be eligible for supplemental security income under the Social Security Act, Mitchell must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment is not severe, then she is not disabled.  The Commissioner then determines whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If so, the claimant is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If the claimant can do so, she is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

In cases involving mental impairments, the Commissioner undergoes an additional evaluation process to determine the severity of such impairment(s).  20 C.F.R. § 416.920a.  Specifically, the Commissioner rates the degree of functional

loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  20 C.F.R. § 416.920a(c)(3).  If the mental impairment is found to be severe, the Commissioner then determines if it meets or equals a listed mental disorder.  20 C.F.R. § 416.920a(d)(2).  If the severe impairment does not meet or equal a listed mental disorder, the Commissioner proceeds to perform an RFC assessment.  20 C.F.R. § 416.920a(d)(3).

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire

administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).

The Court must also consider any evidence that fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal

quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

A.     Application of Regulations for Substance Abuse

As her first point on this appeal for judicial review, Mitchell argues that the ALJ legally erred by failing to analyze her claim for disability under the appropriate regulatory framework governing substance abuse.  Mitchell contends that the ALJ's failure to cite to the relevant Regulations and case law demonstrates that he wholly failed to undergo the required analysis as required by the Regulations.  For the following reasons, Mitchell's argument is misplaced.

In 1996, Congress eliminated alcoholism or drug addiction as a basis for obtaining social security benefits.  *See Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010).  "An individual shall not be considered disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 1382c(a)(3)(J).  The Regulations set out a two-step process in cases involving evidence of substance abuse.  First, the ALJ must determine if the claimant's symptoms, regardless of cause, constitute a disability.  *Kluesner*, 607 F.3d at 537; 20 C.F.R. § 416.935(a).  If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether the disability would exist in the absence of the substance abuse.  *Kluesner*, 607

F.3d at 537.  As such, the ALJ's finding of disability "is, in effect, a 'condition precedent' to applying the special rule on alcoholism and drug addiction."  Frank S. Bloch, Bloch on Social Security § 3.39 (2003), *cited approvingly in Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003).  *See also Fastner v. Barnhart*, 324 F.3d 981, 986 (8th Cir. 2003) ("Generally, a determination under . . . § 416.935(b) is only necessary if the ALJ has found that the sum of that individual's impairments would otherwise amount to a finding of disability.").

Here, upon consideration of all of the effects of Mitchell's symptoms, regardless of cause and including those attributable to Mitchell's marijuana use, the ALJ determined that Mitchell was not disabled.  Absent a finding of disability, the ALJ was not required to assess the materiality of Mitchell's substance abuse or addiction under § 416.935.  *Fastner*, 324 F.3d at 986.  Accordingly, the ALJ did not err by failing to invoke the Regulations to address Mitchell's substance abuse disorder.

B.     Failure to Follow Prescribed Treatment

Mitchell next argues that the ALJ legally erred by assigning significance to Mitchell's failure to follow prescribed treatment without considering her mental illness as the reason for such failure.  Mitchell further argues that the ALJ failed to undergo the required analysis when determining that a failure to follow prescribed treatment would preclude a finding of disability.  For the following reasons,

Mitchell's arguments are misplaced.

"Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  Before a claimant is denied benefits because of a failure to follow a prescribed course of treatment, the ALJ must examine the circumstances surrounding such failure and determine on the basis of the evidence of record whether the prescribed treatment would restore the claimant's ability to work or sufficiently improve her condition.  *Burnside v. Apfel*, 223 F.3d 840, 843-44 (8th Cir. 2000); 20 C.F.R. § 416.930(a).

As an initial matter, I note that the ALJ did not base his determination of non-disability on Mitchell's failure to comply with prescribed treatment.  Although Mitchell appears to assert that the ALJ determined that her failure to follow prescribed treatment precluded a finding of disability, I have reviewed the ALJ's decision in its entirety and find that it does not contain such a determination. Instead, a review of the decision shows that the ALJ considered all of the medical evidence of record, which demonstrated that Mitchell's impairments were not disabling.  As noted by the ALJ, treatment records from treating and consulting physicians alike consistently showed normal to near-normal mental status examinations, mild to moderate symptoms as measured by GAF scores, adequate concentration, and Mitchell's engagement in social and academic activities.  The

ALJ further considered Mitchell's subjective complaints and found them not to be

credible to the extent Mitchell claimed her impairments rendered her disabled

during the relevant time.[8]  To the extent the ALJ considered Mitchell's

noncompliance with prescribed treatment as a factor in determining Mitchell's

credibility, such consideration is permissible.  *Wildman v. Astrue*, 596 F.3d 959,

968-69 (8th Cir. 2010).  Indeed, noncompliance with a doctor's instructions to take

medication and abstain from alcohol and drugs is a valid reason to discredit a

claimant's subjective complaints.  *Id.*  Finally, the ALJ considered the

demonstrated improvement of Mitchell's impairments with appropriate treatment.

As noted by the ALJ, multiple instances documented throughout the medical

record demonstrate sufficient medical improvement upon Mitchell's compliance

with prescribed treatment.  Indeed, the record shows that Dr. Robinson observed

Mitchell to be stable and her psychiatric symptoms to significantly decrease when

she regularly took her medications as prescribed.  In addition, Dr. Robinson noted

that Mitchell "clearly improved" with ECT treatments, and he thereafter

---

[8]  Although Mitchell does not challenge the ALJ's credibility determination here, a review of the
ALJ's decision nevertheless shows that, in a manner consistent with and as required by *Polaski
v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly
considered the subjective allegations of Mitchell's disabling symptoms on the basis of the entire
record before him and set out numerous inconsistencies detracting from the credibility of such
allegations.  The ALJ may disbelieve subjective complaints where there are inconsistencies on
the record as a whole.  *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ's
credibility determination is supported by substantial evidence on the record as a whole.  I am
therefore bound by this determination.  *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).

consistently assigned GAF scores of 60 or 65 indicating only mild to moderate symptoms. The record also demonstrates a consistent pattern of relapse when Mitchell failed to take her medication as prescribed or declined recommendations for further treatment. Impairments that are controllable or amenable to treatment do not support a finding of disability. *Roth*, 45 F.3d at 282. To the extent Dr. Robinson nevertheless opined that Mitchell's psychiatric condition rendered her disabled, an ALJ need not defer to a treating physician's opinion that an applicant is totally disabled "because it invades the province of the Commissioner to make the ultimate disability determination." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (internal quotation marks and citation omitted).

Mitchell also argues that the ALJ should have considered her mental impairment as the reason underlying her failure to follow prescribed treatment. A review of the record, however, shows many occasions on which Mitchell's mother determined for Mitchell to either not take the prescribed medication or to take it at a different dose. A parent's failure to consistently administer effective medication as prescribed without good reason can be a proper ground for denying disability benefits. *Blake ex rel. Blake v. Barnhart*, 28 Fed. Appx. 597, 599 (8th Cir. 2002) (unpublished) (per curiam) (*citing Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). The record also shows Mitchell's noncompliance to coincide on many occasions with her use of marijuana. Mitchell's noncompliance with prescribed

treatment appears to be the result of things other than mental illness.  *Cf. Pate-Fires v. Astrue*, 564 F.3d 935, 946 (8th Cir. 2009).

Mitchell argues, however, that the ALJ inadequately considered her diagnosed impairment of bipolar disorder as a cause for her noncompliance because he failed to find the impairment to be severe at Step 2 of the sequential evaluation.  I find the ALJ's failure to identify this impairment at Step 2 to be harmless error.   Because the ALJ found Mitchell to suffer other severe impairments, including severe mental impairments such as depression and anxiety, he was required to consider any non-severe impairments when determining Mitchell's RFC.  20 C.F.R. § 416.945(a)(2).  Subsequent to his analysis at Step 2 and indeed throughout the remainder of his decision, the ALJ considered and discussed Mitchell's complaints and symptoms relating to all of her mental impairments - including bipolar disorder - as well as her providers' observations and the treatment rendered and recommended for her impairments.  Given the ALJ's inclusion of Mitchell's bipolar disorder in his overall analysis, the failure to find the condition to be a severe impairment at Step 2 was harmless.  *See Maziarz v. Secretary of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010); *see also Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1133 (C.D. Cal. 2009).

Accordingly, I find that the ALJ considered the entirety of the record in

determining whether Mitchell's impairments were disabling.  Although the ALJ

considered Mitchell's noncompliance with prescribed treatment as a factor in

determining her credibility, which he is permitted to do, the ALJ did not base his

adverse determination only on Mitchell's noncompliance.  The ALJ was therefore

not required to examine the circumstances surrounding such noncompliance and

determine on the basis of the evidence of record whether the prescribed treatment

would restore Mitchell's ability to work or sufficiently improve her condition.

C.      Medical Opinion Evidence

        Finally, Mitchell argues that the ALJ erred by according no weight to the

opinion of her treating physician, Dr. Robinson; by according great weight to the

opinion of the state agency consultant, Dr. Morgan; and by failing to define the

weight given to the opinion of the examining consulting physician, Dr. Kruger.

        In evaluating opinion evidence, the Regulations require the ALJ to explain

in the decision the weight given to any opinions from treating sources, non-treating

sources, and non-examining sources.  *See* 20 C.F.R. § 416.927(f)(2)(ii).[9]  The

Regulations require that more weight be given to the opinions of treating

physicians than other sources.  20 C.F.R. § 416.927(d)(2).  A treating physician's

---

[9]  Citations to 20 C.F.R. § 416.927 are to the 2011 version of the Regulations, which were in
effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most
recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this
discussion but does not otherwise change the substance therein.

assessment of the nature and severity of a claimant's impairments should be given

controlling weight if the opinion is well supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with other substantial

evidence in the record.  *Id.; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th

Cir. 2004).  This is so because a treating physician has the best opportunity to

observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2).  However, a medical source's opinion that an applicant

is "unable to work" involves an issue reserved for the Commissioner and is not the

type of opinion which the Commissioner must credit.  *Ellis v. Barnhart*, 392 F.3d

988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion.  20 C.F.R. § 416.927(d)(2).  Such factors include the length of the

treatment relationship and the frequency of examination, the nature and extent of

the treatment relationship, whether the treating physician provides support for his

findings, whether other evidence in the record is consistent with the treating

physician's findings, and the treating physician's area of specialty.  *Id.*  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  *Id.*

An ALJ does not err in giving less than controlling weight to a treating physician's opinion where substantial evidence on the record shows the claimant to have been noncompliant with prescribed treatment without good reason.  *Brown v. Barnhart*, 390 F.3d 535, 540-51 (8th Cir. 2004).  In addition, an ALJ may discount or even disregard a treating physician's opinion if the physician renders inconsistent opinions that undermine their credibility.  *Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005).  Finally, inconsistency with other substantial evidence alone is sufficient to discount a treating physician's opinion.  *Id.*

Here, the ALJ discounted the various opinions of Dr. Robinson and provided good reasons therefor.  First, the ALJ found Dr. Robinson's opinion that Mitchell was disabled to be an issue reserved to the Commissioner and not a medical opinion entitled to deference.  The ALJ did not err in this determination.  *Ellis*, 392 F.3d at 994-95.  The ALJ discounted Dr. Robinson's March 2011 and October 2011 Assessments – wherein he essentially opined that Mitchell had no useful ability to function in any area – finding them to be inconsistent with his own treatment records in that they 1) failed to account for Mitchell's noncompliance

with treatment and her continued substance abuse; 2) were inconsistent with his GAF scores indicating mild to moderate symptoms; and 3) were based, in part, on Mitchell's subjective complaints, determined by the ALJ not to be credible.  For the following reasons, substantial evidence on the record as a whole supports these reasons to discount Dr. Robinson's opinions.

As discussed above, Dr. Robinson's treatment records show that when Mitchell was compliant with her treatment regimen, she was more stable, actively and successfully engaged in social and academic activities, and exhibited less symptomatic behavior.  Indeed, throughout most of her treatment with Dr. Robinson, Mitchell was assigned GAF scores between 51 and 65, indicating mild to moderate symptoms, and was continually assigned GAF scores of 60 and 65 after undergoing ECT treatment.  In his Assessments, Dr. Robinson opined that Mitchell was functionally unable to perform any work activity, but he did not account for Mitchell's repeated noncompliance with her medication and treatment regimen – a regimen that proved successful when followed.  In light of Mitchell's failure to continue with ECT treatments, stop marijuana use, and follow instructions regarding her prescribed medications, the ALJ did not err in considering Dr. Robinson's failure to account for Mitchell's noncompliance in his determination to discredit the physician's opinions.  *Owen v. Astrue*, 551 F.3d 792, 799-800 (8th Cir. 2008).

In addition, Dr. Robinson's opinions were rendered at the same time he assigned GAF scores indicating that Mitchell exhibited mild to moderate symptoms.  Indeed, on October 17, 2011, the same date of his opinion that Mitchell had poor or no ability to engage in essentially any work-related activities, Dr. Robinson examined Mitchell and assigned a GAF score of 65.  This inconsistency between a treating physician's treatment records and his simultaneous functional assessment provides good reason for an ALJ to discount the physician's opinion.  *See Halverson v. Astrue,* 600 F.3d 922, 930 (8th Cir. 2010); *Goff,* 421 F.3d at 791 (ALJ  not compelled to give controlling weight to physician's opinion where GAF score of 58 was inconsistent with opinion that claimant suffered from extreme limitations); *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666 (8th Cir. 2003).

Finally, the ALJ noted that Mitchell's subjective complaints made to Dr. Robinson were "so extreme" that they were not credible, including Mitchell's reports of violent behavior toward others and her reported hallucinations.[10]  The ALJ noted that such extreme behavior would have likely resulted in more frequent psychiatric hospitalizations or have legal consequences.  The ALJ further noted that Dr. Robinson's mental status examinations of Mitchell essentially yielded

---

[10]  As noted *supra* at n. 8, Mitchell does not challenge the ALJ's credibility determination.

normal results despite Mitchell's extreme subjective reports of psychotic behavior.
*See Halverson,* 600 F.3d at 930.  Where a treating physician's opinions are largely
based on a claimant's subjective complaints rather than on objective findings, an
ALJ does not err in giving such opinions less than controlling weight.  *Renstrom,*
680 F.3d at 1064.

With respect to Dr. Kruger's May 2010 psychological evaluation, Mitchell
argues that the ALJ committed reversible error by failing to identify what weight
he accorded the opinions therein.  As noted above, an ALJ must explain the weight
given to opinions from treating sources, non-treating sources, and non-examining
sources.  20 C.F.R. § 416.927(f)(2)(ii).  By explaining the weight given to medical
source opinions, an ALJ both complies with the Regulations and assists the Court
in reviewing the decision.  *See Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir.
2008).  Substantial evidence does not support an ALJ's decision if it cannot be
determined what, if any, weight the ALJ afforded the opinion of a medical source.
*McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008); *see also Woods v. Astrue*,
780 F. Supp. 2d 904, 913-14 (E.D. Mo. 2011).

Here, the ALJ thoroughly summarized the results of Dr. Kruger's
psychological evaluation of Mitchell and specifically noted Dr. Kruger's summary
of Mitchell's subjective complaints as well as her own objective findings that
Mitchell was fully oriented with no disturbances in attention and concentration;

had good eye contact and appropriate grooming and dress; had no deficits in motor functioning, speech, auditory comprehension, and memory; had appropriate thought content with intact and goal-directed thought processes; had average intellectual ability; and had adequate judgment, insight, and reasoning.  Although Dr. Kruger rendered an opinion as to Mitchell's diagnoses and prognosis, she gave no opinion as to the severity of Mitchell's impairments, what Mitchell could still do despite her impairments, or any physical or mental restrictions.  *See* 20 C.F.R. § 416.927(a)(2) (setting out contents of medical opinions).  Nevertheless, the ALJ noted Dr. Kruger's objective observations during the mental status examination to be consistent with the results of such examinations by Dr. Robinson and consistent with the opinions rendered by Dr. Morgan.  As such, when considered in view of the decision *in toto*, I am able to determine that the ALJ accorded some weight to Dr. Kruger's observations as demonstrated by his finding that they were consistent with other substantial evidence on the record that he credited.  Accordingly, although the ALJ did not use specific terms to identify the precise weight he accorded Dr. Kruger's limited opinion or her findings, the failure to do so here does not require his finding of non-disability to be set aside.  *See Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (administrative finding not required to be set aside when deficiency in opinion-writing technique has no bearing on outcome).

Finally, with respect to Dr. Morgan's May 2010 Assessment, the ALJ determined to accord great weight to the opinions rendered therein, finding them to be the most consistent with the evidence of record, including the results of the mental status examinations as reported by Dr. Robinson and the consultative psychological examination by Dr. Kruger.  While opinions of non-treating practitioners who have attempted to evaluate a claimant without examination do not normally constitute substantial evidence on the record as a whole, *Coleman,* 498 F.3d at 772, the ALJ did not rely on Dr. Morgan's opinion alone in determining Mitchell not to be disabled.  Instead, as noted above, the ALJ considered Dr. Robinson's treatment notes which showed, more often than not, that Mitchell had normal mental status examinations and exhibited only mild to moderate symptoms.  The ALJ also considered the results of Dr. Kruger's psychological evaluation which likewise showed a normal mental status examination and less than disabling symptoms.  Because Dr. Morgan's Assessment was consistent with this substantial medical evidence, the ALJ did not err in considering Dr. Morgan's Assessment in determining Mitchell's RFC.  *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (not error for an ALJ to consider opinion of state agency consultant rendered upon review of the medical evidence which was consistent with medical evidence of record).

A review of the ALJ's decision shows the ALJ to have evaluated all of the

- 66 -

opinion evidence of record and to have adequately explained his consideration thereof such that I can determine what weight the ALJ afforded the medical source opinions. Where, as here, there are conflicts in the medical opinion evidence, it is the duty of the Commissioner to resolve such conflicts. *Renstrom*, 680 F.3d at, 1065; *Spradling v. Chater*, 126 F.3d 1072, 1075 (8th Cir. 1997); *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). For the reasons set out above, substantial evidence on the record as whole supports the ALJ's determination as to the weight he accorded the opinion evidence in this cause.

## VII. Conclusion

For all of the foregoing reasons, the Commissioner's decision that Mitchell was not under a disability since February 16, 2010, is affirmed. Because the Commissioner committed no legal error and there is substantial evidence on the record as a whole to support the Commissioner's decision, I may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court might have reached a different conclusion. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *see also Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and Mitchell's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 8th day of January, 2014.